11m - 5164 - JCB

## AFFIDAVIT

I, JEFFREY A. CADY, being duly sworn, depose and state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice.  I have been an FBI Special Agent for the past 16 years.  For approximately the past 9 years, I have worked on investigations of the New England Organized Crime Family of La Cosa Nostra (LCN or NELCN), which operates in Rhode Island and Massachusetts.  I have monitored court-ordered wiretaps and oral intercepts; prepared and executed search warrants; and interviewed admitted members of the La Cosa Nostra.  I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I am submitting this affidavit in support of an application for an arrest warrant for DANIEL A. SPOONER, who was born in 1958 and lives in Mattapoisett, Massachusetts, for violation of 18 U.S.C. § 1951, Hobbs Act extortion.

3.      The information in this affidavit comes from my own participation in this investigation, my conversations with other law enforcement officers, and my review of documents including reports written by other law enforcement officers.  This affidavit does not contain everything that I have learned during this investigation, but includes sufficient facts to demonstrate that there is probable cause to arrest SPOONER for Hobbs Act extortion.

4.      A criminal history check on SPOONER revealed numerous arrests and convictions from 1977 through July 25, 2011.  These include, among others, convictions for armed robbery, assault on a police officer, assault and battery, and interfering with a police officer.

5.      I participated in a physical surveillance of SPOONER on August 1, 2011. SPOONER is a muscular, physically imposing individual who appears to be approximately 6 feet tall and to weigh approximately 225 pounds. On August 1, 2011, SPOONER arrived bare-chested, which I believe was for the purpose of intimidating and collecting an extorted payment from the complainant as described below.

## OVERVIEW OF INVESTIGATION

6.      On July 19, 2011, an individual telephoned the Boston Division of the FBI regarding an extortion that DANIEL SPOONER was attempting to perpetrate. According to the caller, SPOONER represented himself to be a "strong arm" guy for a "made member" of the Providence LCN.

7.      I am aware that the NELCN frequently relies upon individuals who have a propensity for violence to instill fear in members of the community, to enable the NELCN to maintain control over certain business interests, both legal and illicit. These individuals are referred to as "muscle," "strong arms" or "enforcers." I am also aware that full-fledged members of the LCN are said to be "made members" or soldiers.

8.      On July 21, 2011, I met with the caller who will be referred to throughout the remainder of this affidavit as the complainant or complaining witness. I was able to fully identify him. The complainant told me that he owns a particular company. I have independently confirmed the existence of that named company and that he is the principal of that business.

9.      The complainant's business sells prepaid cellular telephone cards through vending machines located in Massachusetts.

10.     The complainant has advised me that he purchases his machines from World Touch Technologies in Georgia; that he buys monitors and printers for those machines from Happ Controls in Illinois; that the switch that generates the PINS for his telephone calling cards is located in Texas; and that the calling cards are used for interstate phone calls as well as intrastate phone calls.

11.     Once a customer purchases a prepaid calling card from one of the complainant's vending machines, the customer can then play a video poker game or a video slots game on the machine. A customer who wins the game earns points that are redeemable for cash or prizes.

12.     The complainant told me that he first met DANIEL SPOONER a number of years ago. The complainant positively identified SPOONER from the Massachusetts driver's license photograph of SPOONER that I showed to the complainant.

13.     During 2011, DANIEL SPOONER approached the complainant's son-in-law. SPOONER said that he needed to speak with the complainant.

14.     During early July, 2011, the complainant met with SPOONER in the parking lot of the Dartmouth Fitness Center in Dartmouth, Massachusetts. During this initial meeting, SPOONER claimed that he was a "strong arm enforcer" for an unnamed older "made guy" operating out of the Providence, RI, area. SPOONER claimed that he "went to bat" for the complainant with this unnamed "made guy" but felt that the complainant was going to be required to pay $10,000 in order to continue operating his vending business. SPOONER said that everybody associated with a vending business in New England was required to pay such a "protection" payment in order to operate. Furthermore, SPOONER advised that if the complainant failed to pay this protection payment, the complainant or his family would be harmed. The complainant stated that he told

SPOONER that he was going to check out this request, implying that he wanted to verify SPOONER's Organized Crime ties.

15.     I am aware that for many years, members of the NELCN have extorted "rent" or "tribute" or "protection" payments from people in the video game machine business.

16.     On or about July 16 or 17, 2011, DANIEL SPOONER left a detailed voicemail message on the complainant's cellular telephone. The complainant recognized the voice as that of DANIEL SPOONER. I have listened to that voicemail message. In the message, SPOONER indicated that he was getting backed into a corner and that the complainant was "taking kindness for weakness." SPOONER went on to say that there is something called "accountability" and with that comes "consequences." SPOONER advised that "tradition" is not going to be broken here and the complainant would not get a pass. Furthermore, SPOONER said that he was being forced to do something he did not want to do because of the complainant's unwillingness to pay the requested money. SPOONER also advised that the complainant was getting off "dirt cheap," apparently referring to the amount of money requested. SPOONER indicated that SPOONER has people to answer to. The message was cut off because it exceeded the allotted time for a message.

17.     On or about July 16 or 17, 2011, SPOONER left the complainant another detailed voicemail message. SPOONER said that the complainant better answer his "fucking" phone and stop what he is doing because he is causing "major havoc" in SPOONER's world. SPOONER, who was agitated at times during this message, said that there are "obligations," "accountability" and "fucking consequences." SPOONER then made a reference that they previously agreed to this payment and that the complainant is not going to break a 50 to 100 year tradition. SPOONER made a reference to the fact that the complainant indicated that he wanted to call someone in Boston,

Massachusetts to attempt to verify this money request. SPOONER advised the complainant that he was pissing off the wrong people.

18.     On July 22, 2011, SPOONER left the complainant another detailed message on the complainant's voicemail. SPOONER said that the complainant better do what he is supposed to do regarding the requested payment because SPOONER does not know how much longer he can protect him. SPOONER indicated that the complainant better take his call or SPOONER will come and will "fucking find you." SPOONER reiterated that the complainant is not going to get a "pass" on paying this money. Near the end of the message, SPOONER talked about being "swift" and "aggressive."

19.     On July 26, 2011, the complainant made a consensually recorded telephone call to SPOONER at the telephone number 508-758-9098 (which I have confirmed, through Anywho.com, to be subscribed to by SPOONER). SPOONER did not answer, and the complainant left a message indicating that he would like to meet SPOONER at the gym on the following day at around 10:30 a.m.

20.     On July 26, 2011, SPOONER left a detailed message on the complainant's cellular telephone. SPOONER said that SPOONER had been incarcerated all weekend on an assault charge. SPOONER advised the complainant that this charge stemmed from an altercation he had with a Middle Eastern male on a beach.

21.     NCIC records confirm that SPOONER was arrested during July 2011 for assault with a dangerous weapon. SPOONER was apparently released on bail.

22.     Later on July 26, 2011, SPOONER left another detailed message on the complainant's cellular telephone. SPOONER acknowledged leaving the previous message. SPOONER described the incident which led to his arrest over the weekend for assault and battery with a dangerous

weapon.  SPOONER told the complainant to take care of his own situation.  SPOONER told the complainant not to tell him that he has not been making money because SPOONER has proof to the contrary.

23.     On July 28, 2011, the complainant consensually recorded a telephone call to SPOONER at telephone number 508-758-9098.   During this call, SPOONER advised the complainant that SPOONER had been sick in bed.  SPOONER stated that he was looking forward to getting this situation over with and advised the complainant that SPOONER would call back on the next day to schedule a meeting.

24.     On July 28, 2011 at approximately 11:57 a.m., the complainant consensually recorded a telephone call to the phone number of a particular individual (whose identity I know) who has been convicted in Rhode Island Superior Court of felonious assault on two separate occasions.  The individual did not answer, so the complainant left a message stating that he was looking to verify the demand made by SPOONER.  While the complainant was leaving this message, the individual for whom the complainant was leaving this message called the complainant's phone.  That return call was also recorded.  During that conversation, the complainant said that a mutual friend had advised the complainant to make this contact in an attempt to verify that an individual who was looking to collect some money from the complainant was actually working for someone in Providence, RI.  The complainant explained that he wanted to make sure he wasn't getting scammed.  The individual replied that he had to be careful talking on the phone and that he would call him back within 30 minutes.

25.     On July 28, 2011 at approximately 1:25 p.m., DANIEL SPOONER left a detailed message on the complainant's cellular telephone.  SPOONER stated that he just got a call from

Providence. SPOONER said he wanted to know what the complainant was doing. SPOONER asked

whether the complainant was looking to get "character references" on SPOONER. SPOONER

claimed that the complainant's actions made SPOONER look "weak." SPOONER stated that the

complainant was starting trouble that he could not handle and that the complainant should call

SPOONER back.

26.     On July 28, 2011 at approximately 1:30 p.m., the complainant consensually recorded

a telephone call to SPOONER at telephone number 508-758-9098. During this conversation,

SPOONER voiced his displeasure with the complainant for calling the other individual in an attempt

to see if this request was a scam. SPOONER advised the complainant that people were questioning

SPOONER as to what he was doing on his end. SPOONER thereafter stated that he was only doing

what he was told. SPOONER said that the complainant should never doubt SPOONER because

SPOONER is not trying to "scam" the complainant. SPOONER stated that the complainant will

never know what SPOONER had to do to cover for him. SPOONER terminated the call by saying

that he would call back later.

27.     On July 29, 2011 at approximately 8:46 p.m., SPOONER left a detailed message on

the complaining witness's cellular telephone. During this message, SPOONER said that he had been

in bed for a few days but indicated that he wanted to meet up with the complainant at the gym on the

next day at approximately 9:00 a.m.

28.     On July 30, 2011, SPOONER left a detailed message on the complainant's cellular

telephone. SPOONER advised that at approximately 9:00 a.m., he would be heading to the gym.

Additionally, SPOONER stated that he has a friend who is involved in the casino business in Las

Vegas, NV, who may be interested in purchasing some of the complainant's vending machines.

SPOONER requested that the complainant meet him at the gym and bring along some "flyers" for his vending machines. In closing, SPOONER advised the complainant not to "leave him hanging" at the gym and bring the "flyers."

29.     On July 30, 2011, SPOONER left a detailed message on the complainant's cellular telephone. During this message, SPOONER stated that he is not playing a "game" today and advised that if the complainant did not come down and see him at the gym that SPOONER was going to go the street where the complainant lives (and SPOONER correctly identified that street). It is my belief that SPOONER's reference to this address was SPOONER's way of warning that he knew where the complainant resided and was a further attempt to threaten him. Thereafter, SPOONER indicated that he had a "commitment" for his evening "if you know what I mean." I believe that SPOONER was referring to having a "commitment" to meet with his Organized Crime associates in Providence, RI, regarding the complainant's extortion payment. In closing, SPOONER again stated that "tonight's the commitment" and that the complaint needs to get a hold of SPOOONER.

30.     Also on July 30, 2011, SPOONER once again left a detailed message on the complainant's cellular telephone. During this message, SPOONER advised the complainant that he was making the "mistake of a lifetime" by not meeting with him. SPOONER stated that he did not know who was conning the complainant or what kind of game he was playing by not meeting with SPOONER. SPOONER, who was very agitated during this call told the complainant, stated "But you better fucking call me right back. Because, you motherfucker, you wait. You better call me right back motherfucker and if I find out you're talking to somebody else or playing a game with somebody else you're all gonna die." SPOONER then hung up.

31.     Later on July 30, 2011, SPOONER left yet another detailed message on the complainant's cellular telephone. During this message, SPOONER, who appeared to be very agitated, said that the complainant was putting SPOONER's life at risk. SPOONER stated that the complainant was aware, from a previous message, that SPOONER had an obligation for that evening. I believe that this was SPOONER's way of conveying that he would have a meeting on that date with his purported Organized Crime associate from Providence, RI. SPOONER stated, "You fucking wait. If I don't hear from you, I don't see you, I'm going to find you on my father's eyes. I will come to you, okay." (I understand this to mean that SPOONER was swearing, on his father's eyes, that he was going to take action against the complainant.) SPOONER warned the complainant that "nobody is gonna do this to me and get away with it." Again, SPOONER stated that the complainant was making the biggest mistake of his life. SPOONER ended the call by saying "Okay, motherfucker, watch what, watch what happens now."

32.     On July 31, 2011 at approximately 1:50 p.m., SPOONER left a detailed message on the complainant's home answering machine. During this message, SPOONER advised the complainant that he needed to speak with him as soon as possible. SPOONER said that he could be reached on his home number which was the same number that the complainant had been calling. Thereafter, SPOONER stated, "I'm expecting to hear from you or else I'm gonna have to come and find you to speak with you. Ah, I've already been by your house." I believe that this comment was an attempt by SPOONER to further threaten the complainant by conveying that SPOONER knew where the complainant lives and has been by the complainant's home.

33.     On August 1, 2011 at approximately 11:12 a.m., the complainant consensually recorded a telephone call to SPOONER at telephone number 508-758-9098. During this

conversation, the complainant attempted to set up a meeting with SPOONER. SPOONER stated that he would call the complainant back within an hour.

34.    Later on August 1, 2011 at approximately 11:50 a.m., SPOONER telephonically contacted the complainant on his cellular telephone. The complainant consensually recorded this conversation. During this conversation, SPOONER advised the complainant that his car was in the shop, and they eventually agreed to meet at the gym on this date at approximately 1:30 to 1:45 p.m.

35.    Starting at approximately 1:43 p.m. on August 1, 2011, the complainant consensually recorded a meeting with SPOONER at the Dartmouth Total Fitness, 360 Faunce Corner Road, North Dartmouth, MA. Prior to this meeting, I provided the complainant with $1,000 in cash to provide to SPOONER. I instructed the complainant to attempt to elicit information from SPOONER concerning the identity of his Organized Crime contact in Providence, RI. During the course of this meeting, which was surveilled by members of the FBI Organized Crime Squad, a large, bare-chested, muscular white male who I was able to positively identify as DANIEL SPOONER from his license photo approached and met with the complainant. During the recorded conversation, SPOONER said that he has been doing this (collections) all his life and this is the hardest account he has ever collected. The complainant advised SPOONER that he has been involved in the vending business all his life and has never paid anyone any protection and or extortion payments. SPOONER responded to the complainant by saying that he must have paid, and that "they" told me to collect the money from you. The complainant asked SPOONER if he was going to be required to pay any additional money after paying the $10,000. SPOONER replied that SPOONER would not collect any more money from him.

36.     During this meeting, the complainant attempted to get SPOONER to acknowledge who he worked for in Organized Crime in Providence, RI. SPOONER refused to identify this individual but told the complainant that if he ever has a problem with anyone to call SPOONER. SPOONER stated that he does not "drop names" and told the complainant that he was getting off "dirt cheap" and should be paying $10,000 per *month*. Near the end of this meeting, SPOONER got upset when he realized that the complainant had only brought $,1000 and not the entire $10,000 as demanded. SPOONER stated that he already called them and told them he had the money. SPOONER claimed that he was scheduled to deliver this money later on this date. SPOONER stated that he wanted the remaining money. SPOONER eventually took $1,000 and walked away from the meeting with the complainant.

37.     Later on August 1, 2011, the complainant telephonically contacted this writer and advised that SPOONER called him from the gym approximately within a half hour of this meeting and left him a message saying that the complainant had until the following day to come up with the remaining money.

38.     It is my belief based on my experience and training that DANIEL SPOONER was threatening bodily harm to the complainant to compel him to make a "protection" payment to be able to continue to operate his vending business.

39.     Since August 1, 2011, SPOONER has left additional threatening voicemail messages for the complainant.

40.     I have seen a criminal history printout that indicates that the complainant has been arrested for various crimes, one of which is listed as being a perjury charge in state court during the

1980s. However, I have not been able to determine whether the complainant actually was arrested for or convicted of perjury.

41.     The complainant provided me with accurate information about the date, time, and location of the August 1, 2011 meeting with SPOONER. In addition, I have personally listened to the consensually recorded telephone calls described above, and they are consistent with what the complainant had originally told me about the threat from SPOONER.

42.     Based on these facts and circumstances I have reason to believe and do in fact believe that probable cause exists to charge DANIEL SPOONER with violation of 18 U.S.C. §1951, Extortion.

JEFFREY A. CADY
Special Agent
Federal Bureau of Investigation
Providence, Rhode Island

Subscribed and sworn to before me this ___4th___ day of August, 2011.

Judith Gay Dein
U.S. Magistrate Judge